UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

CREDIT SUISSE SECURITIES (USA) LLC,

                Plaintiff,          11 Civ. 0232 (JGK)

     - against -          MEMORANDUM OPINION
                                  AND ORDER

GRAND CIRCLE LLC and
GRAND CIRCLE RIVER CRUISE LINES LLC,

                Defendants.

————————————————————————————

JOHN G. KOELTL, District Judge:

These are cross-motions for partial summary judgment in a dispute between the plaintiff, Credit Suisse Securities USA, LLC ("Credit Suisse"), and the defendants, Grand Circle LLC and Grand Circle River Cruise Lines LLC (collectively, "Grand Circle"). The dispute concerns the meaning of a provision in a contract calling for Credit Suisse to act as financial advisor to Grand Circle in conjunction with the sale of Grand Circle to potential buyers. The clause at issue required Grand Circle to pay a $1 million fee to Credit Suisse in the event that Grand Circle decided not to consummate a sale following receipt of a bid reaching a given threshold amount. Credit Suisse contends that it obtained such a bid and that Grand Circle decided not to consummate a sale, and therefore Credit Suisse is entitled to

1

the fee.  Grand Circle contends there was no qualifying bid to accept.  In its first and third causes of action, Credit Suisse alleges that Grand Circle breached the contract and was unjustly enriched by failing to pay this fee.  Grand Circle argues that it was never required to pay the fee.

I.

Unless otherwise indicated, the following facts are not in dispute.

A.

Credit Suisse is a Delaware corporation with its principal place of business in New York.  (Am. Compl ¶ 2; Answer to Am. Compl. ¶ 2.)  Grand Circle is incorporated in Delaware with its principal place of business in Boston, Massachusetts.  (Am. Compl. ¶ 3; Answer to Am Compl. ¶ 3.)  Grand Circle offers vacation and cruise packages to clients over the age of fifty. (Def.'s Rule 56.1 Stmt. in Supp. of Motion for Summ. J. ¶ 5; Pl.'s Rule 56.1 Stmt. in Opp. to Motion for Summ. J. at 5.)  It has been owned by CEO and Chairman Alan Lewis and his family since 1985.  (Decl. of Thomas J. Butters in Supp. of Def.'s Motion for Partial Summ. J. ("Butters Decl."), Ex. D at 12; Def.'s Rule 56.1 Stmt. in Supp. of Motion for Summ. J. ¶ 5;

2

Pl.'s Rule 56.1 Stmt. in Opp. to Motion for Summ. J. at 5.)  In 2007, Grand Circle had forty offices and 2,500 employees worldwide, and generated earnings before interest, taxes, depreciation, and amortization ("EBITDA") of $90 million. (Def.'s Rule 56.1 Stmt. in Supp. of Motion for Summ. J. ¶ 5; Pl.'s Rule 56.1 Stmt. in Opp. to Motion for Summ. J. at 5.)

B.

On April 25, 2006, Credit Suisse and Grand Circle entered into an agreement (the "2006 Agreement") calling for Credit Suisse to serve as "exclusive financial advisor [to Grand Circle] with respect to the Sale . . . of [Grand Circle]." (Decl. of Joshua C. Klein in Supp. of Pl.'s Motion for Partial Summ. J. ("Klein Decl."), Ex. C at 1.)  The agreement called for Credit Suisse to be paid 0.50% of "aggregate consideration" in the sale of Grand Circle if such consideration was less than $500 million; 2.0% of "aggregate consideration" greater than or equal to $500 million but less than $750 million; and 5.0% of "aggregate consideration" greater than or equal to $750 million. (Klein Decl., Ex. C at 2.)  "Aggregate consideration" was defined to include:

- The "total fair market value . . . of all consideration . . . paid or payable . . . to [Grand Circle]," plus

3

- The "principal amount of all indebtedness for borrowed money (exclusive of customer deposits), capital leases and preferred stock obligations of [Grand Circle] assumed, retired, repaid, redeemed or defeased in connection with the Sale or remaining on the balance sheet of the [Grand Cirlce] at the closing of the Sale," minus

- The "sum of . . . the amount of any cash or cash equivalents on [Grand Circle's] balance sheet at the time of the closing of the Sale . . . and . . . the amount of any [Grand Circle] Cash as of immediately prior to the closing of the Sale distributed to the Company's owners in connection with the sale," plus

- The "capitalization of any leases entered into in contemplation of the Sale in connection with the m/s Paul Gauguin valued assuming 8.0x the annual lease expense obligation."

(Klein Decl., Ex. C at 2-3.)  No fee other than reimbursement for "reasonable expenses" up to $75,000 was to be paid to Credit Suisse if no sale was consummated.  (Klein Decl., Ex. C at 2.)

C.

As is customary in the investment banking industry, the sale process under the 2006 Agreement was set to occur as a two-phase auction.  (Butters Decl., Ex. G at 14-15; Klein Decl., Ex. D at 17-18.)  In the first phase, Credit Suisse would prepare a short document of informational materials about the business being sold, called a "teaser," which would be sent to potentially interested buyers.  (Butters Decl., Ex. G at 14; see Klein Decl., Ex. U.)  Those who expressed further interest after receiving the teaser would receive a more robust information

4

packet, called a Confidential Information Memorandum ("CIM"),
which would contain detailed business and industry analysis.
(Butters Decl., Ex. G at 14-15; see Klein Decl., Ex. T.)
Interested buyers would then be invited to submit what Credit
Suisse bankers described in testimony as first-round "bids" or
"proposals," (Butters Decl., Ex. G at 15; Klein Decl., Ex. D at
17, 61), and what the potential buyers themselves described as
"indication[s] of interest" and "non-binding Indicative
Offer[s]." (Klein Decl., Ex. F at 2, 8, 12, 14.) If an
interested buyer submitted a bid that was considered acceptable,
the buyer would be "moved to a due diligence phase," and,
eventually, invited to make a "final offer." (Butters Decl.,
Ex. G at 15; see also Klein Decl., Ex. D at 17-18.)

     In response to its marketing efforts under the 2006
Agreement, Credit Suisse received four preliminary bids for the
purchase of Grand Circle. (Klein Decl., Ex. F at 2, 8, 12, 14;
see Klein Decl., Ex. D at 20; Klein Decl., Ex. E at 21.)
However, on August 18, 2006, Grand Circle CEO and Chairman Alan
Lewis "decided to stop the sale process" after concluding that
the offers he received for Grand Circle were not strong enough.
(Klein Decl., Ex. G at 1; see also Klein Decl., Ex. H at 1.)
The only payment received by Credit Suisse in conjunction with
its performance under the 2006 Agreement was reimbursement for

its out-of-pocket expenses.  (Klein Decl., Ex. A at 71-72; Klein Decl., Ex. I.)

D.

Despite the aborted sale process in 2006, Mr. Lewis and Credit Suisse resumed discussions about the sale of his company in early 2007.  (Klein Decl., Ex. A at 74; Klein Decl., Ex. E at 23; Klein Decl., Ex. K at 33-34.)  These discussions culminated on May 9, 2007 in a new agreement (the "2007 Agreement") between Credit Suisse and Grand Circle for the provision of financial advice in connection with the sale of Grand Circle.  (Klein Decl., Ex. P at 1.)  Like the 2006 Agreement, the 2007 Agreement called for reimbursement of "reasonable expenses"—this time up to $100,000.  (Klein Decl., Ex. P at 2.)  Although neither Agreement required Credit Suisse to provide financing to potential buyers, both agreements acknowledged that "Credit Suisse may provide or otherwise assist prospective purchasers in obtaining, all or a portion of the financing with respect to a proposed sale."  (Klein Decl., Ex. C at 4; Klein Decl., Ex. P at 4.)

Despite their overall similarity, the 2007 and 2006 Agreements differed in two ways.  First, the "transaction fee" due to Credit Suisse upon sale of Grand Circle was to be 1.10%

of aggregate consideration if the sale was made on or before March 31, 2008, and 0.90% of aggregate consideration if the sale was made after March 31, 2008; "aggregate consideration" was defined in terms identical to the terms used to define it in the 2006 Agreement. (Klein Decl., Ex. C at 2-3; Klein Decl., Ex. P at 2-3.)

Second, the 2007 Agreement contained a new clause (deemed a "walk-away" clause by the plaintiff, a "no-success" clause by the defendants, and referred to in this Opinion as the "Contingency Clause") calling for payment of a fee in the event that Grand Circle decided not to consummate a sale satisfying certain conditions. (Klein Decl., Ex. P at 2.)  The Contingency Clause provided:

> In the event the Company decides for any reason not to consummate a Sale following receipt of a bid valuing the Company at not less than 7.0 times the Company's 2007 earnings before interest, taxes, depreciation and amortization, a Transaction Fee of $1.0 million shall be payable at the time the Company decides not to pursue a Sale.

(Klein Decl., Ex. P at 2.)

This clause was revised once before it was finalized. Initially, on April 26, 2007, Credit Suisse proposed a clause that provided: "[i]n the event the Company decides for any reason not to consummate a Sale following receipt of either i) preliminary bids, or ii) final bids, a Transaction Fee of $2.0

million shall be payable at the time the Company decides not to
pursue a Sale." (Klein Decl., Ex. M at 3; see also Klein Decl.,
Ex. D at 52, 65.) In a May 1, 2007 letter to Credit Suisse's
Rodney Miller, Grand Circle's outside counsel stated that Mr.
Lewis "believe[d] . . . the fee [in the Contingency Clause]
should be $1 million, and should be conditioned upon receipt of
an offer valuing [Grand Circle] at not less than seven times
2007 EBITDA, which [Mr. Lewis] understands is the low end of the
anticipated valuation range." (Klein Decl., Ex. O at 1.)
Accordingly, a new draft of the agreement enclosed with this
letter provided for a $1 million fee to Credit Suisse upon
decision by Grand Circle not to consummate a sale following
receipt of a "bid valuing" Grand Circle at not less than seven
times the 2007 EBITDA. (Klein Decl., Ex. O at 4.) Credit
Suisse accepted this language, and there were no further
revisions. (See Butters Decl., Ex. J at 1; Klein Decl., Ex. O
at 4; Klein Decl., Ex. P at 2.)

Credit Suisse's Adam Davies testified that the reason for
adding a Contingency Clause to the 2007 Agreement was to ensure
that if Credit Suisse "again[] delivered offers but [Mr. Lewis]
decided not to sell, he'd still owe [Credit Suisse] some
payment." (Klein Decl., Ex. D at 60.) In other words, "[i]t
wasn't a reward. It wasn't an upside. . . . [T]he intent

was . . . to put [Mr. Lewis] on the hook a little bit . . . [so that he would] have some skin in the game." (Klein Decl., Ex. D at 59.) Similarly, Credit Suisse's Simon Taurins testified that "the concept here was that if we had done all of the work to bring about an offer from a buyer and Alan chose not to take it any further, at whatever point that was, then we would still be paid for the work that we had done." (Klein Decl., Ex. E at 42.)

Mr. Davies described the concept of paying a fee for receiving a bid as unusual in the investment banking context. (Butters Decl., Ex H at 52, 69.) More typical is a retainer fee that is creditable against the fee owed to the bank in the event of a successful sale. (Butters Decl., Ex. H at 69.) Indeed, in an April 26 email to Mr. Miller, referring apparently to the first draft of the Contingency Clause, Mr. Davies explained:

> it was my intention that the $2mm be paid irrespective of bids being received, so that if we spin wheels for several months and then nothing happens we get the money. Given we are now close to a launch, I am happy to go to 'decides not to consummate a Sale following receipt of proposals, a Transaction fee'. I am wary of being more specific on 'proposal' as they will no doubt come back with fully financed, diligenced final bids and that is not something we can agree to. [Mr. Lewis] could decide to pull the plug after indicative bids if they are all in the 5's and 6's, and so 'proposal' could include indicative bids and we get paid.

(Butters Decl., Ex. J.)

E.

The sale process under the 2007 Agreement also proceeded in the form of a traditional two-phase auction.  (Klein Decl., Ex. D at 61.)  Accordingly, in May 2007 Credit Suisse prepared a six-page "teaser" on Grand Circle's business that it distributed to potential buyers.  (Klein Decl., Ex. D at 22-23; Klein Decl., Ex. U.)  Shortly thereafter, Credit Suisse circulated a CIM with a more detailed analysis of Grand Circle's business.  (Klein Decl., Ex. D at 22-23; Klein Decl., Ex. T.)  Then, in June 2007, Credit Suisse sent letters to potential buyers "inviting [them] on behalf of Grand Circle to submit a preliminary non-binding indication of interest . . . to acquire [Grand Circle]."  (Klein Decl., Ex. V at 1.)  These letters stated that an "indication of interest" must contain, among other things, "[t]he purchase price (in US$) [the buyer] propose[s] to offer to acquire 100% of [Grand Circle] on a debt and cash free basis (Enterprise Value)."  (Klein Decl., Ex. V at 1.)  Grand Circle received responses from more than ten interested parties.  (Klein Decl., Ex. A at 122-26; Klein Decl., Ex. W.)

From among these interested parties, Credit Suisse selected four second-round auction participants—Court Square Capital Partners ("Court Square"), Golden Gate Private Equity, Inc., KSL Capital Partners, and Apollo Management VI, L.P.  (Klein Decl.,

10

Ex. AA at 1, 7, 12, 17.)  These participants submitted proposal letters to Credit Suisse containing the terms upon which they intended to purchase Grand Circle.  (Klein Decl., Ex. AA at 1, 7, 12, 17.)

The Court Square letter proposed that an "aggregate purchase price to be paid for 100% of the outstanding stock of [Grand Circle] w[ould] be $725 million and w[ould] be paid in cash . . . ."  (Klein Decl., Ex. AA at 2.)  It made this price contingent upon Grand Circle's having a cash balance of no less than $150 million at closing, and it called for the price to be "adjusted upward or downward based on the extent Working Capital is greater or lesser than a mutually agreeable definition and target for Working Capital at closing."  (Klein Decl., Ex. AA at 2.)  It also set forth a proposal for financing the acquisition. (Klein Decl., Ex. AA at 2.)  Court Square indicated that it was prepared to commit up to $225 million in equity capital.  (Klein Decl., Ex. AA at 2.)

Court Square was selected as the finalist from among the second-round participants.  On November 5, 2007, Court Square and Grand Circle entered an "exclusivity agreement," which required Grand Circle to negotiate exclusively with Court Square until November 21, 2007.  (Klein Decl., Ex. BB at 1.)  The exclusivity agreement set forth a new purchase price of $744

11

million, which "assume[d] that [Grand Circle] has available not less than $100 million of cash on the balance sheet at closing. To the extent that balance sheet cash is less than $100 million, seller will contribute cash to the extent of the shortfall." (Klein Decl., Ex. BB at 6.)  Court Square would also pay $26 million for certain transaction "fees and expenses."  (Klein Decl., Ex. BB at 6.)

On December 7, 2007, Court Square and Grand Circle entered into a "sale and purchase agreement" ("SPA") for the purchase of Grand Circle for $770 million—a price that included $26 million of expenses and fees.  (Klein Decl., Ex. A at 149-50; Klein Decl., Ex. K at 81-83; Klein Decl., Ex. CC; Klein Decl., Ex. DD at 4; Klein Decl., Ex. EE at 4.)  The SPA set a closing date of February 15, 2008, and provided that either party could terminate the agreement if closing did not occur before March 31, 2008.  (Klein Decl., Ex. CC at 57, 61.)[1]

Although some of the details are contested, some time prior to July 13, 2007 Credit Suisse either offered or proposed a financing package to Court Square of roughly $525 million. (Butters Decl., Ex. S at 27-28; Butters Decl., Ex. T at 1; Butters Decl., Ex. V at 3.)  This amount decreased progressively

---

[1] Citations to Exhibit CC of the Klein Declaration use the original page numbers that were assigned by the document's creators.

over the following summer months, to less than half that amount by March 2008. (Butters Decl., Ex. F at 2-4, 24-28; Butters Decl., Ex. M at 26-27; Butters Decl., Ex. O at 1; Butters Decl., Ex. S at 33-35; Butters Decl., Ex. Y.)

As part of the sale process, Grand Circle made presentations to two credit rating agencies, Moody's and Standard & Poor's, about the nature of the Court Square transaction and the strength of its business. (See Klein Decl., Ex. DD; Klein Decl., Ex. EE.) One of the slides prepared for each of these presentations contained a bullet point stating that "Court Square Capital Partners . . . and Alan Lewis agreed to acquire Grand Circle Corporation . . . for a total transaction value of $770.0 million (including fees and expenses) . . . , or 8.0x FY 2007E Pro Forma Adjusted EBITDA." (Klein Decl., Ex. DD at 4; Klein Decl., Ex EE at 4.) The next slide in each of the presentations stated that "fees and expenses" totaled $26 million. (Klein Decl., Ex. DD at 5; Klein Decl., Ex. EE at 5.)

Lawrence Hamdan, who at the time was managing Credit Suisse's role in the Grand Circle-Court Square deal, attributed the failure of the deal to close by the February 2008 closing date to the "volatility in the financing markets." (Butters Decl., Ex. M at 59.) Similarly, Credit Suisse's David Berger

13

explained that "volatility in the financing markets led to a decrease in the leverage." (Butters Decl., Ex. S at 35.)  By late February, Mr. Lewis and Grand Circle CFO Nick Lento were already discussing alternatives to the deal: in an email from February 27, 2008, Mr. Lento told Mr. Lewis's assistant that he had "communicated [his] thoughts to Alan verbally re: next steps on Paul Gauguin[, a Grand Circle cruise ship,] and GCC recapitalization if deal does not go through." (Klein Decl., Ex. OO.)  And in an April 2, 2008 email from Credit Suisse's Peter Kuhn to Lawrence Graham and Matthew Grogan with the subject line, "GCC Update," Mr. Kuhn wrote that it "[s]ounds like Alan is . . . at the end of his rope." (Butters Decl., Ex. AA.)

Meanwhile, on April 2, 2008, Court Square's Joe Silvestri wrote an email to Mr. Lewis advising him that Mr. Silvestri was "working on a number of fronts to find a solution to the financing problem." (Butters Decl., Ex. Z.)  The email then lists a number of verbal commitments Mr. Silvestri had received from various entities willing to finance Court Square's debt. (Butters Decl., Ex. Z.)  On April 6, 2008 Mr. Lewis wrote a letter to Mr. Silvestri in which he explained that

> [i]t is important . . . that I receive a term sheet from you Tuesday morning outlining the terms of a deal Court Square can unconditionally close by April 30th.  If on Monday evening . . . you have only $100 million of the $170

14

million circled, I am expecting you to specify in detail
how Court Square will satisfy the remaining portion of the
second lien financing to close the deal by April 30th.

The deal, as currently structured would generate the same
amount of net cash after taxes as ship refinancing.  Any
further reduction in cash received at closing from a sale
transaction makes recapitalization a stronger option for my
family.

(Butters Decl., Ex. BB.)

On that same day, Mr. Lento emailed Mr. Lewis and informed

him that Mr. Silvestri had "requested [to see] th[e 2007

Agreement] several times," and that Mr. Lento had "resisted

sending it because . . . the second full paragraph on page 2

might give Joe the wrong impression that we would accept a

valuation of 7X 2007 EBITDA (approx $630 million vs the $744

current deal valuation) . . . ."  (Klein Decl., Ex. FFF.)

Two days later, Mr. Lewis circulated a memorandum to his

internal advisors entitled "Scenarios" and outlining "three

scenarios currently before [him]."  (Klein Decl., Ex. JJ at 1.)

"Scenario One" entailed continuing with the Court Square deal;

"Scenario Two" entailed refinancing the Grand Circle cruise

ships; and "Scenario Three" entailed the Lewis family retaining

the business for another three to five years and then revisiting

the option of selling it.  (Klein Decl., Ex. JJ at 1-2.)  The

memorandum contained an attachment called "Estimate of Cash at

Closing of Sale of Grand Circle Travel Company," and listing

various adjustments to be made to the $744 million purchase
price in the SPA in order to calculate the amount of cash that
Grand Circle would receive from Court Square at closing.  (Supp.
Decl. of Joshua C. Klein in Opp. to Def.'s Motion for Partial
Summ. J. ("Supp. Klein Decl."), Ex. B at 2.)  Among the
adjustments to be made was the subtraction of $6 million payable
to Credit Suisse as its "investment banking fee," the amount of
which was based on the following calculation: "Assumption: Sale
closes post 3.31.08: Trans Fee = 0.90% X Aggregate Consideration
of $744M-100M."  (Supp. Klein Decl., Ex. B at 2.)  Also included
in the various subtractions to be made was $31 million reserved
for "Bonus Payments," and a "Cash Shortfall from [the] $100M
Threshold" of $18 million.  (Supp. Klein Decl., Ex. B at 2.)
The resulting estimated net cash from the deal at closing was
$168.5 million.  (Supp. Klein Decl., Ex. B at 1-2.)

     In an April 11, 2008 email, Court Square's Christopher
Boise assured Mr. Lewis and Mr. Lento that Court Square
"continue[d] to make good progress on the financing front" and
suggested a day of meetings with potential lenders the following
week.  (Klein Decl., Ex. RR.)  However, the previous day, Grand
Circle's Susan Thompson had sent an email on behalf of Mr. Lewis
to Donna Desmond of Kensington Investment Company ("Kensington")
stating that "Alan wanted . . . to tell you that they will be

16

refinancing the ships this year—around $180M from refinancing

within the next 90 days.  No other distributions in next 2

years.  We will be repaying the loans." (Klein Decl., Ex. PP.)

Then, on April 11, Mr. Lewis informed Mr. Silvestri that Grand

Circle would no longer proceed with the deal:

> We have made a decision and we feel it is best for the
> Lewis Family to maintain ownership of Grand Circle.
>
> I appreciate all the time and effort you have put into it,
> especially around your personal involvement over the past
> few weeks with regards to the financing.  I feel this
> process has gone on too long for both the family and the
> organization.  This was a difficult decision for the family
> to make.

(Klein Decl., Ex. SS.)  Following this email, Mr. Lewis sent a

flurry of emails to his employees and business advisors.  In one

such email he wrote:

> Dear Associates,
>
> We have decided not to sell Grand Circle to Court Square.
> We believe this is the right decision for the company and
> our family at this time.  We are very proud of what we have
> achieved together over the past 23 years and feel a
> responsibility to ensure the company has the right
> leadership to move forward.  We understand that the sale
> process has been long and difficult.  The shut down of the
> credit markets really slowed down the process.  Despite the
> fact that the financing did finally come through, we feel
> it is best not to sell the company at this time.  We don't
> expect to re-evaluate our decision to sell for at least 3
> years.

(Klein Decl., Ex. TT at 1.)

Mr. Lewis also forwarded this email to employees of

Kensington, and further informed them that Grand Circle "is in

17

the process of refinancing our ships—we already have one
agreement in hand.  This will be $180-200M in revenue and we
feel it will be complete within 60-90 days." (Klein Decl., Ex.
UU.)  A few minutes later, he emailed Kensington's Robert
Weiler, Jim Best, Guil Spencer, and James O'Brien, thanking them
for their support in the sale process and reiterating that "[i]t
was a very difficult decision to make, but the family has
decided to not sell." (Klein Decl., Ex. VV at 1.)  He further
acknowledged that he had "spoken with Court Square—they were
extremely upset." (Klein Decl., Ex. VV at 1.)  A couple hours
later, Mr. Lewis emailed Jordan Golding, a member of his
advisory board, to inform him that he and his wife had "decided
not to move forward with the sale of Grand Circle," and that he
was "planning . . . to refinance the ships with a target revenue
of $180-200 million" and already had "one agreement in hand
[that was] expected to be finalized within 60-90 days." (Klein
Decl., Ex. WW at 1.)  Grand Circle sent letters that same day to
Credit Suisse and Court Square, officially terminating the SPA
and the 2007 Agreement. (Klein Decl., Ex. YY; Klein Decl., Ex.
ZZ.)  In a May 1 letter to Mr. Lento, Mr. Lewis stated, "[a]s
you are well aware, a very important part of me deciding not to
continue to pursue the Court Square deal (which looked
problematic to me) was I felt that we could have a

18

recapitalization, which would also help the Lewis Family."
(Klein Decl., Ex. XX.)

On May 14, 2008, Credit Suisse sent Grand Circle an invoice
listing a $1 million "Advisory Fee" and a $110,636.68 fee for
"Out-of-Pocket Expenses." (Klein Decl., Ex. AAA at 2.) Grand
Circle attempted to wire $100,000 to Credit Suisse on August 26,
2008, but Credit Suisse returned the funds. (Klein Decl., Ex.
BBB at 1-3.) To date, no other payments have been made.


                                  F.

In this action, Credit Suisse alleges that Grand Circle's
failure to pay the $1 million contingency fee constitutes a
breach of the 2007 Agreement, entitling Credit Suisse to the $1
million fee, plus $100,000 of expenses incurred in its
performance under the 2007 Agreement, along with attorney fees.
(Am. Compl. ¶¶ 34-37.) On November 7, 2012, Grand Circle moved
for partial summary judgment on the first and third causes of
action in the complaint, which allege breach of contract and
unjust enrichment. (Am. Compl. ¶¶ 34-37, 42-45.) Credit Suisse
cross-moved for summary judgment on the first cause of action.

III.

The standard for granting summary judgment is well established. "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998) (collecting cases).  If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law.  Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of America, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012) (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

Summary judgment in a breach-of-contract action is appropriate when the words of the contract "convey a definite and precise meaning absent any ambiguity." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citing Heyman v. Commerce and Indus. Co., 524 F.2d 1317, 1320 (2d Cir. 1975); Painton & Co. v. Bourns, Inc., 442 F.2d 216, 233 (2d Cir. 1971)).  Where, on the other hand, "the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become[s] an issue of fact and summary judgment is inappropriate."  Id. at 428 (citing Heyman, 524 F.2d at 1320; Painton & Co., 442 F.2d at 233).  However, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation"—rather, each interpretation must be reasonable.  Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (collecting cases).  An interpretation is not reasonable if it "strain[s ]the contract language beyond its reasonable and ordinary meaning."  Id. (citing Bethlehem Steel Co. v. Turner Construction Co., 141 N.E.2d 590, 593 (N.Y. 1957)).

IV.

The parties agree that New York law applies to this controversy pursuant to the New York choice-of-law clause in the 2007 Agreement.  (Klein Decl., Ex. P at 7.)  The elements of a breach of contract claim under New York law are "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) nonperformance by the other party; and (4) damages attributable to the breach."  Mazzola v. Roomster Corp., 849 F. Supp. 2d 395, 402 (S.D.N.Y. 2012) (quoting IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 402 (S.D.N.Y. 2009)).  There is no dispute as to the existence of a contract or the existence of damages in the event of breach.  At issue in this case are the second and third elements: whether Credit Suisse performed by obtaining a qualified bid and whether Grand Circle breached the contract by failing to consummate a sale after receiving that bid.

The Contingency Clause provides that "[i]n the event [Grand Circle] decides for any reason not to consummate a Sale following receipt of a bid valuing the Company at not less than 7.0 times the Company's 2007 [EBITDA], a Transaction Fee of $1.0 million shall be payable at the time the Company decides not to pursue a Sale." (Klein Decl., Ex. P at 2.)  It is undisputed that seven times Grand Circle's 2007 EBITDA is equal to $630

23

million.  Thus, Grand Circle's obligation to pay the contingency
fee is triggered upon satisfaction of two conditions: 1) receipt
of a "bid valuing" Grand Circle at $630 million or more, and 2)
Grand Circle's "deci[sion] for any reason not to consummate a
Sale" following receipt of such bid.  In order to prevail in
this action, Credit Suisse must establish that both of these
conditions were satisfied.  For Grand Circle to prevail, it must
establish that either one of these conditions was not satisfied.
For purposes of the present motions, each party must establish
that no reasonable inference from the record supports the
opposing party's position.

A.

Credit Suisse argues that the term "bid valuing" has only
one reasonable interpretation—namely, the face value of a bid
offering to purchase the company.  Grand Circle contends that
"bid valuing" cannot be taken to mean the face value of a bid—
rather, the term contemplates that certain adjustments be made
to the face value of a bid in order to determine whether the
contingency fee has been triggered.  By Credit Suisse's metric,
the Court Square bid was worth $744 million, which clearly
surpasses the $630 million threshold in the Contingency Clause.

By Grand Circle's reasoning, the Court Square bid was worth significantly less that the requisite $630 million.[2]

As a threshold matter, the term "bid valuing" is facially ambiguous.  The parties could simply have used the term "bid," which, standing alone, would support Credit Suisse's position. But the addition of the word "valuing" adds ambiguity: it suggests some method for computing value, without specifying what that method should be.  There are material issues of fact as to whether the Court Square bid was a "bid valuing" Grand Circle at no less than $630 million.

Credit Suisse has proffered reasonable arguments in support of its position that the Court Square bid valued Grand Circle at no less than $630 million.  In particular, Credit Suisse emphasizes an April 2008 email from Mr. Lento to Mr. Lewis in which Mr. Lewis explained that he was reluctant to show the 2007 Agreement to Mr. Silvestri because Court Square might see the Contingency Clause and get the wrong impression of what purchase price Grand Circle might ultimately accept: "I have resisted sending it because: . . . the second full paragraph on page 2 might give Joe the wrong impression that we would accept a

---

[2] In their papers and at oral argument, the parties focused exclusively on the Court Square bid that is contained in the SPA.  Accordingly, the question of whether any other first- or second-round bids that Grand Circle received during the 2007 sale process triggered the contingency fee is not addressed here.

valuation of 7X 2007 EBITDA (approx $630 million vs the $744 current deal valuation) . . . ." (Klein Decl., Ex. FFF at 1.) There is no response from Mr. Lewis in the record, and Mr. Lento's email can be read to indicate his conclusion that the Court Square deal provided a "valuation" of Grand Circle at $744 million.

Similarly, the joint presentations by Credit Suisse, Grand Circle, and Court Square to Moody's and Standard & Poor's in January 2008 stated that the "transaction value" of the deal between Grand Circle and Court Square was "$770.0 million (including fees and expenses)," and that such "fees and expenses" amounted to $26 million. (Klein Decl., Ex. DD at 4-5; Klein Decl., Ex. EE at 4-5; see also Klein Decl., Ex. A at 149-50; Klein Decl., Ex. K at 81-83.)

On the other hand, Credit Suisse's position focusing on the face value of the bid effectively asks the Court to read the term "valuing" out of the phrase "bid valuing the company at [$630 million]." This is contrary to the familiar canon of interpretation calling for courts to "avoid construing a contractual provision in a manner that renders contractual language meaningless or superfluous." Eastman Kodak Co. v. STWB Inc., 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002) (citing Two Guys

26

from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 472 N.E.2d
315, 318 (N.Y. 1984)).

Moreover, neither the April 2008 email chain nor the
presentation for Moody's and Standard & Poor's refers
specifically to an interpretation of the Contingency Clause.
When construing the meaning of a contract, a court's role is to
give effect to the intent of the parties "as it existed *at the
time the contract was executed*." U.S. ex rel. Falco Constr.
Corp. v. Summit Gen. Contracting Corp., 760 F. Supp. 1004, 1013
(E.D.N.Y. 1991) (emphasis added) (citing New England Merchs.
Nat'l Bank v. Iran Power, 502 F. Supp. 120, 127 (S.D.N.Y.
1980)).  The parties' objective manifestations of their intent—
namely, "their words to each other and their deeds"—are
significantly more probative than "uncommunicated subjective
intent."  Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust
Co., No. 13 Civ. 1582, 2013 WL 1890278, at *19 (S.D.N.Y. May 8,
2013); see also SR Int'l Bus. Ins. Co. v. World Trade Ctr.
Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006) ("[A] party's
uncommunicated subjective intent cannot supply the ultimate
meaning of an ambiguous contract . . . .").  Thus, the evidence
marshaled by Credit Suisse is relevant only as an indication of
what the parties may have intended when they drafted the final
version of the contract, and it is significantly less probative

than would be an objective manifestation of intent expressed at the time of drafting.

Like Credit Suisse, Grand Circle proffers some evidence that would support a reasonable inference in favor of its interpretation of "bid valuing."  Grand Circle relies on the expert testimony of Andrew McKey.  Mr. McKey opines that a qualifying "bid valuing" Grand Circle had to be based on an enterprise value of at least $630 million.  Computing enterprise value requires subtracting the acquired company's cash because this cash is obtained by the purchaser and therefore effectively reduces the purchase price.  (Butters Decl., Ex. F at 8, 16, 18.)  Mr. McKey concludes that $142 million that the SPA required Grand Circle to leave on its balance sheet at the time of closing must be subtracted from the face value of Court Square's $744 million bid.[3]  (Butters Decl., Ex. F at 44, 50-51, 59.)  This reduction brings the value of the bid down to $602 million, which is below the seven-times-EBITDA threshold amount of $630 million.

---

[3] This sum consists of multiple independent line items identified by Mr. McKey, including: 1) $100 million in cash not specifically earmarked for any purpose, and 2) $42 million in cash earmarked to cover closing bonuses and other expenses. (Butters Decl., Ex. F at 50-51.)

In addition to these cash reductions, Mr. McKey suggests that other adjustments must be made to the face value of the bid in order to reflect the enterprise value of Grand Circle. (Butters Decl., Ex. F at 18, 44-51, 59.)  It is unnecessary to reach the appropriateness of these additional deductions.

The record shows that at the time of the solicitation and receipt of bids, the parties were indeed focused on enterprise value and the amount of cash held by Grand Circle.  When Credit Suisse solicited the first-round bids, it specified that an "indication of interest" must contain, among other things, "[t]he purchase price (in US$) [the buyer] propose[s] to offer to acquire 100% of [Grand Circle] on a debt and cash free basis (Enterprise Value)."  (Klein Decl., Ex. V at 1.)  In its second-round offer letter, Court Square stated that Grand Circle "would be required to have a cash balance equal to an amount no less than $150 million at closing."  (Klein Decl., Ex. AA at 2.)  And the exclusivity agreement between Grand Circle and Court Square "assume[d] that [Grand Circle] ha[d] available not less than $100 million of cash on the balance sheet at closing," while requiring that Grand Circle make up for any shortfall if "balance sheet cash is less than $100 million."  (Klein Decl., Ex. BB at 6.)  The SPA similarly refers to cash to be left on Grand Circle's balance sheet.[4]  (Klein Decl., Ex. CC at 3, 12.)  Thus, Court Square's bid was premised on a significant amount of cash remaining with Grand Circle when it was acquired.  There

---

[4] In a spreadsheet attached to Mr. Lewis's April 8, 2008 "Scenarios" memorandum, Grand Circle acknowledged this obligation and confirmed that as of March 31, 2008, it needed to contribute $18 million to the balance sheet in order to comply with it.  (Supp. Klein Decl., Ex. B at 2.)

are genuine issues of material fact as to whether cash left in Grand Circle at the time of the acquisition should be subtracted from the face value of Court Square's bid in assessing the amount of the "bid valuing" Grand Circle.[5]

Because the Contingency Clause itself does not specify the proper metric for determining whether it has been triggered, and because there are genuine issues of material fact as to whether the Court Square bid qualified as a triggering bid, neither party is entitled to summary judgment on the basis of its interpretation of the term "bid valuing."

### B.

The second condition that must be satisfied before the contingency fee is triggered is that Grand Circle have "decide[d] for any reason not to consummate a Sale."  The

---

[5] Grand Circle also proffers another possible metric for "valuing" a bid: "aggregate consideration."  This is the metric specified in the 2007 Agreement for calculating the fee due to Credit Suisse in the event of a consummated sale.  If aggregate consideration were used to value a bid for Contingency Clause purposes, cash from the balance sheet would also have to be subtracted, and the bid would sink below the $630 million threshold.  However, the Contingency Clause does not use the term "aggregate consideration," and there is no indication in the 2007 Agreement that "aggregate consideration" should be used to define "valuing" in the Contingency Clause.  The fact that the term "aggregate consideration" is used in an entirely different clause of the contract, and not in the Contingency Clause, renders this argument meritless.  Cf. Chepilko v. Cigna Grp. Ins., No. 08 Civ. 4033, 2012 WL 2421536, at *7 (S.D.N.Y. June 27, 2012) (applying the canon of *expressio unius*).

parties dispute whether this condition was satisfied.  Credit
Suisse asserts that Mr. Lewis clearly made a business decision
not to pursue the sale of Grand Circle to Court Square.  Grand
Circle argues that the deal failed not because Grand Circle
decided to abandon it, but because no financially capable buyer
existed.  In other words, no decision not to consummate the sale
was made because there was no decision to make.

The plain meaning of the language at issue here is
unambiguous: the contingency fee is triggered when Grand Circle
decides for any reason not to consummate a sale following
receipt of a qualifying bid.  The motivation for Grand Circle's
decision is immaterial.  If the bid is not a qualifying bid,
Credit Suisse has not earned its right to a contingency fee.
But if Credit Suisse has obtained such a qualifying bid, then
Credit Suisse is entitled to the contingency fee if Grand Circle
decides for any reason not to consummate a sale.  Based on the
evidence, there is no genuine issue of material fact.  The
evidence establishes, and no reasonable factfinder could
disagree, that Mr. Lewis decided not to consummate a sale of
Grand Circle.

In explaining the termination of the SPA, Mr. Lewis clearly
and repeatedly described it as a conscious decision between

31

alternatives.  For example, in his April 11, 2008 email to the company, Mr. Lewis wrote:

> We have *decided* not to sell Grand Circle to Court Square. We believe this is the right *decision* for the company and our family at this time. . . . Despite the fact that the financing did finally come through, we feel it is best not to sell the company at this time.  We don't expect to re-evaluate our *decision* to sell for at least 3 years.

(Klein Decl., Ex. TT at 1 (emphasis added).)  Then, in another email sent a few minutes later, Mr. Lewis reiterated that "[i]t was a very difficult *decision* to make, but the family has *decided* to not sell."  (Klein Decl., Ex. VV (emphasis added).)  Moreover, Mr. Lewis's communications make clear that his decision was in fact a choice between consummating the sale and refinancing the ships owned by Grand Circle.  In his May 1, 2008 letter to Mr. Lento, Mr. Lewis wrote: "[a]s you are well aware, a very important part of me deciding not to continue to pursue the Court Square deal (which looked problematic to me) was I felt that we could have a recapitalization, which would also help the Lewis Family."  (Klein Decl., Ex. XX.)  In other internal communications, he explained that in lieu of consummating the sale he was "planning . . . to refinance the ships with a target revenue of $180-200 million" and, indeed, that at the time he made the decision he already had "one agreement in hand [that was] expected to be finalized within 60-90 days."  (Klein Decl., Ex. WW at 1.)  And, in his April 8

32

memorandum entitled "Scenarios," he described himself as being
at a "crossroads" between three options, one of which was
consummating the Court Square deal.  (Klein Decl., Ex. JJ at 1.)
This evidence demonstrates that Mr. Lewis made a conscious—
indeed, opportunistic—decision not to consummate the Court
Square deal.

　　　Grand Circle points to the increasing difficulties Court
Square experienced in obtaining financing for the deal, and
argues that the deal with Court Square could not close, and that
there was therefore no offer for Grand Circle to accept and no
decision for Grand Circle to make.  Grand Circle emphasizes
testimony by Credit Suisse conceding that if the bidder withdrew
its bid or abandoned the deal before Grand Circle decided not to
consummate a sale, Credit Suisse would not be entitled to the
contingency fee.  (See Butters Decl., Ex. G at 46 (no decision
not to consummate where buyer defaults), Ex. H at 78-79 (no
decision not to consummate where buyer walks away from a deal).)
However, this is not such a case.  When Mr. Lewis decided not to
pursue the sale with Court Square, Court Square had not
defaulted or withdrawn, and Court Square management was plainly
upset by Mr. Lewis's withdrawal from negotiations.  And Mr.
Lewis himself listed the Court Square acquisition as an
alternative he decided not to pursue.

Grand Circle argues in the alternative that Credit Suisse
should not be permitted to recover for Grand Circle's
non-performance under the contract because Credit Suisse caused
the non-performance by offering debt financing commitments to
induce an agreement, and then withdrawing these commitments
before consummation of a sale, thereby preventing Court Square
from being able to close.   Cf. Cross & Cross Props., Ltd. v.
Everett Allied Co., 886 F.2d 497, 501 (2d Cir. 1989) ("[A] party
cannot insist upon a condition precedent, when its non-
performance has been caused by himself." (collecting cases)).
This argument is foreclosed by the fact that Credit Suisse had
no obligation whatsoever under the 2007 Agreement to provide
financing.[6]  (Klein Decl., Ex. P at 4.)  While Grand Circle
acknowledged that Credit Suisse "may provide or otherwise assist
prospective purchasers in obtaining, all or a portion of the
financing with respect to a proposed Sale," Credit Suisse's
provision of financing was not a condition precedent to its
entitlement to the contingency fee.  Furthermore, the
contemporaneous statements by Mr. Lewis reflect that it was his

---

[6] Given that the success fee upon consummation of a sale would
have been significantly greater than the contingency fee, Credit
Suisse had ample motivation to close the deal.  On March 31,
2008, Grand Circle estimated that the success fee due to Credit
Suisse upon consummation of a sale after that date would be $6
million, or six times greater than the contingency fee.  (See
Supp. Klein Decl., Ex. B at 2.)

decision not to consummate the sale and to proceed instead with a refinancing even though he acknowledged that "the financing did finally come through."  (Klein Decl., Ex. TT at 1.)

Because Grand Circle decided not to consummate a sale, Grand Circle's motion for partial summary judgment on this issue must be denied.


V.

Grand Circle has also moved for summary judgment dismissing the third cause of action in the complaint, which alleges that Grand Circle was unjustly enriched by virtue of its failure to pay Credit Suisse's contingency fee.  (Am. Compl. ¶¶ 42-45.) Under New York law, there can be no cause of action for unjust enrichment when there is a valid contract governing the same subject matter between the parties.  Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1272 (S.D.N.Y. 1991) (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)); see also Jofen v. Epoch Biosciences, Inc., No. 01 Civ. 4129, 2002 WL 1461351, at *9 (S.D.N.Y. July 8, 2002).  There is no dispute here as to the existence of a valid contract on the same subject matter between the parties.  Accordingly, Grand Circle's motion for summary judgment dismissing the third cause of action in the complaint

must be granted.   Credit Suisse is either entitled to its bargained-for contingency fee, or not.   The answer to that question turns on whether Grand Circle breached its contract with Credit Suisse to pay that fee.

CONCLUSION

For the foregoing reasons, there are genuine issues of material fact as to whether Grand Circle received a bid valuing the company at more than $630 million.   Therefore, both parties' motions for partial summary judgment on the first cause of action in the complaint are **denied**.   Given the undisputed existence of a valid contract between the parties, Grand Circle's motion for partial summary judgment dismissing the third cause of action in the complaint is **granted**.   The Clerk is directed to **close Docket Nos. 22 and 26**.

**SO ORDERED.**

**Dated:      New York, New York**
**September 23, 2013**      _____/s/_____
                                          **John G. Koeltl**
                               **United States District Judge**

36